**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**CEDRIC HUTTON**                                        **CIVIL ACTION**

**VERSUS**                                               **NO. 11-2857**

**BURL CAIN, WARDEN**                                    **SECTION "I"(5)**

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations pursuant to 28 U.S.C. §636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the Court has determined that a federal evidentiary hearing is unnecessary. See 28 U.S.C. §2254(e)(2).[1] For the following reasons, it is recommended that the instant petition for habeas corpus relief be **DISMISSED WITH PREJUDICE**.

---

[1]Under 28 U.S.C. §2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. §2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. §2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. §2254(e)(2)(B).

**PROCEDURAL BACKGROUND**[2]

The petitioner, Cedric Hutton, is a state prisoner who is presently incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. Hutton was charged by bill of information with armed robbery. On December 6, 2006, following trial by jury in the Twenty-First Judicial District Court for the Parish of Tangipahoa, State of Louisiana, Hutton was found guilty on the lesser charge of first degree robbery. (St. rec. 2, p. 173). Hutton was sentenced to forty (40) years imprisonment at hard labor without benefit of probation, parole, or suspension of sentence.

On appeal, Hutton raised the following claims: 1) the trial court erred in denying his motion for a new trial; 2) he received an excessive sentence; and, 3) he was prejudiced by the fact that a juror, Randy M. Boyette, knew one of the witnesses. On May 2, 2008, the Louisiana First Circuit Court of Appeal affirmed Hutton's conviction and sentence. State v. Hutton, 2008 WL 2065034, No. 2007 KA 2426 (La. App. 1 Cir. 5/2/08). On February 20, 2009, the Louisiana Supreme Court denied Hutton's writ application. State v. Hutton, 1 So.3d 493 (La. 2009).

On March 2, 2009, Hutton sought state post-conviction relief. A review of Hutton's post-conviction application (st. rec., vol. 1) reflects that he argued that his trial counsel was

---

[2]A portion of the procedural history was attained from the Louisiana First Circuit opinion, State v. Hutton, 2008 WL 2065034, No. 2007 KA 2426 (La. App. 1 Cir. 5/2/08).

ineffective based upon the following: 1) counsel failed to subject the State's case to adversarial testing, in part, because counsel failed to challenge two biased jury members; 2) counsel failed to object to the admissibility of "other crimes" evidence; 3) counsel failed to object to the trial judge's remark to the district attorney that the filing of a multiple offender bill would increase Hutton's penalty exposure; 4)counsel failed to use impeachment strategy; 5) counsel failed to file a motion to recuse based upon a conflict of interest; and, 6) the cumulative effect of the above errors resulted in his denial of due process.  On June 2, 2009, the district court, utilizing an Order provided by the State, denied Hutton's post conviction application as violative of "La.C.Cr.P. Arts. 930.4(B) and (C)."  (St. rec., vol. 1).  On October 12, 2009, the Louisiana First Circuit Court of Appeal denied Hutton's writ application without opinion.  State v. Hutton, No. 2009 KW 1262 (La. App. 1 Cir. 10/12/09) (unpublished opinion) (St. rec., vol. 1).  Similarly, on November 12, 2010, the Louisiana Supreme Court denied Hutton relief without opinion.  State ex rel. Hutton v. State, 49 So.3d 879 (La. 2010).

On June 30, 2011, Hutton filed a habeas corpus petition in the United States District Court for the Middle District of Louisiana.  On November 17, 2011, Hutton's petition was transferred to this Court.  A review of the petition reflects that Hutton is claiming that he received ineffective assistance of counsel

3

because: 1) counsel denied him his right to testify at trial; 2) counsel failed to recuse himself due to a conflict of interest; 3) counsel failed to challenge two biased jurors; and, 4) counsel failed to object to "other crimes" evidence.

On January 20, 2012, the State filed a response arguing that claim 1) was unexhausted, and claims 2), 3), and 4) were procedurally barred. (Rec. doc. 12). This Court, however, determined that pursuant to the provisions of 28 U.S.C. §2254(b)(2), a determination on the merits of claim 1) was not precluded. (Rec. doc. 16, p. 2). Further, the Court determined that claims 2), 3), and 4) were not properly dismissed pursuant to an adequate procedural bar. (Rec. doc. 16, pp. 3-6). Accordingly, the Court ordered the State to file a second response addressing the merits.

Having received the State's supplemental response (rec. docs. 22 and 23), the Court shall proceed to address the merits of Hutton's claims following its review of the facts and applicable standard of review.

**FACTS**[3]

On the night of October 5, 2004, in Hammond, Louisiana, Olivier Zieleniecki and Julien Lousao, along with two other

---

[3]The facts noted hereinafter are as set forth by the state appellate court in connection with Hutton's direct appeal. State v. Hutton, 2008 WL 2065034, No. 2007 KA 2426 (La. App. 1 Cir. 5/2/08).

friends, drove to Waffle House after leaving a bar, Mule's. Olivier and Julien were Southeastern Louisiana University students and tennis teammates from France. In the Waffle House parking lot, two girls approached Olivier and Julien and began talking to them. Everyone went inside Waffle House to eat. Olivier's and Julien's friends said they had to leave to get back home, but Olivier and Julien did not yet want to leave. The girls told Olivier and Julien that they would give them a ride home, so Olivier and Julien stayed while their two friends left.

The two girls were Danielle Luneau and Michelle Williams, who lived together and knew the defendant and his friend, Branaken Monroe. Unbeknownst to Olivier and Julien, Danielle and Michelle had conspired earlier with Hutton and Monroe to rob Olivier and Julien. The plan was to get Olivier and Julien into Danielle's car and to drive to a remote location where Hutton and Monroe would be waiting to rob them.

Hutton and Monroe were with Danielle and Michelle when they arrived at Waffle House. When Danielle and Michelle went inside, Hutton and Monroe stayed in the car. Danielle and Michelle told Olivier and Julien that they were leaving, but they would return to give them a ride home. Danielle and Michelle left Waffle House to drop off Hutton and Monroe and returned a short while later to pick up Olivier and Julien. Danielle drove with Michelle in the front seat and Olivier and Julien in the back seat. Danielle drove down

5

a dark, narrow street with no lighting.  Monroe walked into the street and stopped the car.  Hutton and Monroe, who were both armed, approached the car and ordered Olivier and Julien out. Monroe had a rifle on Olivier and forced him on the ground.  Hutton had a handgun on Julien and forced him up against a brick wall near the road.  Monroe took what was in Olivier's pockets, including his wallet, keys, and cell phone.  Julien broke from Hutton and ran away.  Julien eventually found his way to his apartment.

Olivier was forced back into Danielle's car.  Monroe drove and Hutton sat in the front seat.  Danielle and Michelle sat on either side of Olivier in the back seat.  The girls pretended to be frightened.  One of the perpetrators retrieved a credit card from Olivier's wallet and Monroe drove to an ATM machine at Hancock Bank.  Monroe, along with the help of Michelle, used Olivier's credit card to take $400 from the ATM machine, the maximum amount allowed.  Following this, Hutton forced Olivier to give him his watch.  Hutton became angry because he thought Olivier was lying about the $400 limit on his credit card.  Hutton pointed his gun at Olivier's face and pulled the trigger.  The gun did not discharge but only dry-fired.  Hutton and Monroe then jumped out of the car and ran off.  Danielle, Michelle, and Olivier remained in the car. Danielle drove Olivier to his house, and Danielle and Michelle left.  Hutton and Monroe each took some of the $400.  Danielle and Michelle did not get any of the money.

Detective George Bergeron with the Hammond Police Department obtained statements from Hutton, Monroe, Danielle, and Michelle. Hutton's statement was recorded on an audio cassette tape, which was introduced into evidence at trial and played for the jury. In his statement, Hutton admitted to his involvement in the robbery of Olivier.

**STANDARD OF REVIEW**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. §2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under §2254(d)(1) and questions of fact are reviewed under §2254(d)(2). <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1). The United States Supreme Court has noted:

§2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams[ v. Taylor</u>, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(2); <u>see</u> <u>also</u> <u>Hill</u>, 210 F.3d at 485; 28 U.S.C. §2254(e)(1).

**ANALYSIS**

**Ineffective Assistance of Counsel**

To merit relief on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984), by demonstrating that (1) counsel's performance was deficient and (2) that the deficient performance

prejudiced the defense. The burden of proving either element of
<u>Strickland</u> is a heavy one and if proof of one element is lacking,
the Court need not consider the other. <u>Id</u>. at 697. Moreover,
"[i]f the facts adduced at trial point so overwhelmingly to the
defendant's guilt that even the most competent attorney would be
unlikely to have obtained an acquittal, then the defendant's
ineffective assistance claim must fail." <u>Green v. Lynaugh</u>, 868
F.2d 176, 177 (5th Cir.), <u>cert</u>. <u>denied</u>, 493 U.S. 831, 110 S.Ct. 102,
107 L.Ed.2d 66 (1989). In evaluating claims of ineffectiveness,
the Court must be mindful of the strong presumption that counsel's
actions or inactions were part of a sound trial strategy. <u>Murray
v. Maggio</u>, 736 F.2d 279, 282 (5th Cir. 1984); <u>Boyd v. Estelle</u>, 661
F.2d 388, 390 (5th Cir. 1981).

**Denied Right to Testify at Trial**

Hutton claims that he was denied his constitutional right
to testify at a March 7, 2006 pre-trial hearing on a motion to
suppress. Hutton's claim is based upon the following colloquy:

THE COURT:
    Mr. Brown [petitioner's counsel], where is Mr.
Brown? He left?

MR. HUTTON:
    He was going to make a phone call for me real quick.


THE COURT:

I don't guess he was going to put you on, was he?

MR. HUTTON:

    If I got to, I will.

THE COURT:

    No, you don't got to....

MR. BROWN:

    [My] client indicated that he wanted to proffer his own testimony regarding the voluntariness of his own statement. If the Court is inclined to either take that as a proffer or to take into consideration his own statement, he has indicated to me he wants to testify.

THE COURT:

    He wants to proffer it?

MS. PARKER [prosecutor]:

    So that he is not subject to cross-examination.

MR. BROWN:

    You can cross-examine him. He is a big boy.

THE COURT:

    As to the -- he just told me he didn't want to testify....

MR. BROWN:

    Your Honor, that wasn't Mr. Hutton. That was the other individual that said it.

THE COURT:

    You wasn't [sic] in here, Counselor. That man said he didn't want to testify. You want to testify? Get up here and hang yourself. Y'all all got ninth-grade educations, and y'all are arguing with these people that

10

have seven years of college, but if you want to hang yourself, come on up here.

MR. HUTTON:

I am going to wait until my people come out for me.

THE COURT:

No, I don't understand what you mean your people coming out. I don't understand that.

MR HUTTON:

I am going to put it like this. Your Honor, whenever I get in touch with my mother and my little brother at my next trial, I will do what I got to do.

THE COURT:

I understand you don't want to testify....

(St. rec., vol. 3, pp. 289-292).

Thereafter, Hutton argues that his counsel told him that he could not testify at trial based upon the trial court's decision in this earlier proceeding. The Court, initially, does not interpret this colloquy as a ruling by the trial judge that Hutton was precluded from testifying. Rather, the judge appears to have made a finding that Hutton was not going to testify of his own volition during the motion to suppress proceedings.

It is well-established that criminal defendants have the right to testify in their own defense. <u>Rock v. Arkansas</u>, 483 U.S. 44, 51-53 (1987). It is equally clear that a petitioner's denial of his right to testify is subject to "harmless error" analysis.

Bell v. Quarterman, 330 Fed. Appx. 492, 493, 2009 WL 2391575, at *1 (5th Cir.) (per curiam), cert. denied, 130 S.Ct. 805, 175 L.Ed.2d 565 (2009) (affirmed district court's application of harmless error standard to petitioner's claim that he was denied his right to testify); Graham v. Roberts, 96 F.3d 1445 (5th Cir. 1996) (per curiam) (assuming that petitioner's right to testify was denied, it was harmless error).

In the instant case, the evidence against Hutton was overwhelming. Three witnesses positively identified Hutton as one of the robbers. One of the victims, Olivier Zieleniecki, testified that he got a good look at his assailants and positively identified Hutton as the man who pointed a gun at his face and pulled the trigger.[4] (St. rec., vol. 5, pp. 707-709). An accomplice, Danielle Luneau, testified that she had met Hutton on several occasions and that it was Hutton's idea to rob the victims. (St. rec., vol. 5, pp. 742-745). Michelle Williams, a second accomplice, testified that Hutton advised them where to take the victims. When they arrived at the designated location, Hutton, armed with a handgun, stopped the car. Thereafter, they proceeded to a Hancock Bank where Hutton, along with the other armed robber, Branaken Monroe, used Zieleniecki's ATM card to withdraw money. (St. rec., vol. 5, pp. 796-799).

---

[4]For reasons unknown to Zieleniecki, the gun did not fire.

Hutton offers no explanation as to what his testimony would have been to counter the above-described evidence establishing his guilt. Accordingly, even if the Court were to believe that counsel told Hutton he could not testify at trial because the Court had already precluded him from doing so - for which there is only Hutton's self serving testimony - the Court finds that the denial of Hutton's right to testify was harmless error.

**Conflict of Interest**

Hutton argues that his right to conflict-free counsel was violated because a trial witness testifying on behalf of the State was a friend and client of defense counsel. The State has responded that Hutton's argument is without merit as its premise, that an adverse trial witness had a relationship with defense counsel, is incorrect.

A review of the transcript from an October 12, 2005 pre-trial hearing reflects the following regarding a possible conflict of interest:

MR. BROWN:

    Thank you, Your Honor. What we discussed at the bench with all counsel here present and what I also discussed with my client, Mr. Hutton, was the fact that the investigating officer in this matter is one Detective **Edwin** Bergeron with the Hammond Police Department. I have been personal friends with Mr. Bergeron for some years, and Mr. Bergeron, from time to time, is a client of mine. I disclosed that to the Court. It is my understanding that none of the attorneys present nor the

Court sees that being a problem, as far as my continued representation of Mr. Hutton.  I have explained the same to Mr. Hutton, and he has expressed to me personally that he has no objection to my continuing to represent him in this matter.  So I consider the conflict issue having been disclosed and waived, and we can go forward.

THE COURT:

Let me go ahead and put it on the record.  As far as the Court, I think with full disclosure to the client, primarily, I don't have a problem with it.  I don't see a big problem.  Madam D.A.?

MS. MATHENY:

I don't, your Honor.  I just ask that we swear in the Defendant and proffer that for the record so there are no problems post-trial....

(CEDRIC HUTTON SWORN.)

THE COURT:

Mr. Hutton, you have been in Court during all of this discussion about Mr. Brown's knowing the main cop, Mr. Bergeron, in this thing.

MR. HUTTON:

Yes, sir.

THE COURT:

Do you have any problem with keeping Mr. Brown, or do you want to jump horses?

MR. HUTTON:

I don't have any problem with keeping Mr. Brown. The only thing I want to be known to the Court is - - (confers with Mr. Brown).  No, sir, I don't have any problem keeping him.

THE COURT:

He might be able to get more out of that cop than anybody else could, the fact that he knows him. I don't think the cop will lie to his friend. He probably wants to get rid of me. I think he pointed at me, which may not be a bad idea.

(St. rec., vol. 3, pp. 198-200) (emphasis added).

A review of the December 6, 2006 trial transcript reflects that the defense counsel's friend, Hammond Police Officer Edwin Bergeron, was not the investigating officer in this matter and did not offer testimony at trial. According to the State's brief (Rec. Doc. 23), there were two detectives on the Hammond Police Department at all relevant times who were named Bergeron, i.e., Edwin Bergeron and George Bergeron. Counsel identified Edwin Bergeron as his friend and not George.

As evidenced below, Hammond Police Officer **George** Bergeron was the investigating officer and he testified at trial.

EXAMINATION BY MS. MONISTERE [prosecutor]:

Q. Good morning.

A. Good morning.

Q. Please introduce yourself to the jury.

A. **George** Bergeron. I'm a police officer for the City of Hammond Police Department.

Q. How long have you been with the Hammond Police Department?

A. Seven years....

Q. What were your duties back on the date of October 5th of 2004?

A. I was currently assigned to the criminal investigation division.

Q.   Okay.  Does that mean detectives?

A.   Yes.

Q.   What were some of your duties at the detectives' office?

A.   Basically following up on crimes or reports that were sent to us from street patrol.

Q.   How did you become involved in the investigation of the armed robbery that occurred at the ATM on Hancock Bank on the date of October 5, 2004?

A.   That case was assigned to me by the lieutenant.

(St. rec., vol. 5, p.815) (emphasis added).

However, the State does not present any records from the Hammond Police Department or an affidavit from the Police Chief corroborating counsel's statement.  And, in his "Objection to the State's Opposition" (Rec. Doc. 25, p. 9), Hutton refers to the testifying officer as George Edward Bergeron, making it unclear if there were one or two officers named Bergeron on the police force at the time.  Furthermore, it appears that counsel knew George Bergeron as well, as referenced by the following colloquy:

EXAMINATION BY MR. BROWN (defense counsel):

Q.   Detective Bergeron, my name is Douglas Brown. And I represent Mr. Cedric Hutton in this Matter.  I'd like to ask you a few questions.

A.   Okay.

Q.   Just so the record is clear, you and I are acquainted with one another and have been acquainted with one another before this trial; isn't that correct?

A.   Correct.

Q.   And you are affiliated with the fraternal order of police lodge in Hammond, are you not?

A.   Correct.

Q.   And I've performed legal work for the fraternal order of police lodge in Hammond, correct?

A.  Correct.

        Q.  Does that relationship in any way affect you
    testimony here today?

        A.  No, sir.

(St. Rec., vol. 5, p. 823, 824).

It was through Detective Bergeron's predicate testimony that an audio tape of Hutton's confession was placed before the jury. Although Hutton claims that counsel's loyalties were "divided" between him and Detective Bergeron, Hutton fails to state how that is so or what type of impeachment was available that counsel failed to utilize that would have made a difference. Indeed, the trial transcript reflects that counsel objected to the introduction of Hutton's confession before the jury on various grounds. (St. Rec., vol. 5, p. 818, et seq.). Significantly, Hutton does not argue that the tape was not the one given by him or that it had been altered in any fashion.

Accordingly, the Court finds that Hutton's arguments on this issue are without merit.

### Two Biased Jurors

Hutton argues that two of the jurors, Wisdom O. Mensah and Barbara J. Bergeron, were biased against him. Mr. Mensah was allegedly biased based upon his statement that even though his family was poor, they would never steal and when he sees people doing "bad stuff", like stealing, it "makes me mad." (St. rec., vol. 4, p. 428.) Ms. Barbara Bergeron was allegedly biased due to

her relationship, through marriage, to State witness George Bergeron.

Whether or not a juror is biased against a defendant "centers on a juror's own indication that she has 'such fixed opinions that [she] could not judge impartially respondent's guilt,' Patton [v. Yount], 467 U.S. [1025,] 1035, 104 S.Ct. 2885 [(1984)], and whether 'her views would prevent or substantially impair the performance of his or her duties as a juror in accordance with his or her instructions and oath,' United States v. Scott, 159 F.3d 916, 925-26 (5th Cir. 1998)." Seigfried v. Greer, 372 Fed. Appx. 536, 539, 2010 WL 1404046, at *3 (5th Cir. 2010).

With respect to Mr. Mensah, he informed, upon questioning by defense counsel, that he could be impartial and follow the court's instructions.

MR. BROWN:

[Could you] do what the judge instructs you to?


MR. MENSAH:

I'd just do what the judge say.


MR. BROWN:

Okay.

18

MR. MENSAH:

    I ain't, you know, biased or anything.

(St. rec., vol. 4, p. 522).

    With regard to Ms. Bergeron, she explained that State witness George Bergeron was "a cousin of my ex-husband" and that she had not "seen him since he was grammar-school age." (St. rec., vol. 3, p. 408). Thereafter, the court extensively questioned Ms. Bergeron regarding whether or not the above-described relationship would affect her ability to be impartial.

THE COURT:

    [W]ould the fact that your ex-husband's long-time cousin testifies, are you going to believe him more or less if he gets up there and testifies?

MS. BERGERON:

    It wouldn't make any difference.

THE COURT:

    Wouldn't matter one way or the other?

MS. BERGERON:

    No.

THE COURT:

    You can judge his testimony the same as you can judge anybody else?

MS. BERGERON:

    Correct.


THE COURT:

    All right. And the fact that he's kin to, like I say, kin to your ex-husband isn't going [to] matter to you one way or the other?


MS. BERGERON:

    No.


THE COURT:

    You're not going to hold it against him that he's kin to your ex-husband, are you?


MS. BERGERON:

    No.


(St. rec., vol. 3, p. 409).


Based on the above, the Court finds that counsel was neither deficient nor was Hutton prejudiced by counsel's failure to strike Mr. Mensah and Ms. Bergeron. Both clearly indicated that they could impartially judge petitioner's guilt.

### "Other Crimes" Evidence

In his original habeas application, Hutton claims that "other crime" evidence was improperly brought to the jury's attention via the prosecutor's remarks during a bench conference. (Rec. doc. 1, pp. 14-15). Hutton's argument in this regard is

without merit.  The trial transcript reflects that jurors did not hear the prosecutor's remarks.  (St. rec., vol. 5, pp. 693-694).

In his "Objection to the State's Opposition", Hutton claims that "other crime" evidence was improperly brought to the jury's attention via defense counsel's opening remarks.  (Rec. doc. 25, pp. 14-15).  As shown below, this claim is also without merit.

In his opening remarks, defense counsel stated, in pertinent part:

> Now, the State of Louisiana has mentioned quite a bit of evidence.  They've mentioned quite a few things that they intend to show you.  They left a few things out.  One of them that they left out is that a few days before the incident that my client is accused of, the two star witnesses of the State, Ms. Michelle Williams, white female, and Ms. Danielle Luneau, white female, enticed a couple of other men to come join them in Hammond for the purpose of being robbed.
>
> On this occasion that my client is accused of, the evidence will show that Danielle and Michelle also attempted to entice a couple of males to be robbed....
>
> The evidence will show that these two young ladies were charged with four counts, four counts of armed robbery.  Where are they?  Do you see them anywhere in this courtroom?  Do you see them seated beside my client?  One of the questions I would like to ask you, Ladies and Gentlemen of the jury is: Why not?
>
> Why is Mr. Cedric Hutton who was accused of being a part of a criminal conspiracy sitting here....  Why aren't they here.  What happened to them?  The State didn't tell you....
>
> [W]hat I want you to ask yourself is that if the crime of this nightmarish incident that the State described in very vivid detail, this nightmare incident that my client is accused of, well there are some other people accused of this too.  What happened to them?  Where are they?

Equal justice under the law: That is something that we're taught from civics class on up....

[T]hat means that if you believe that somebody was involved in an armed robbery and if you believe that other people are involved in an armed robbery, if they got one kind of justice, then the others should also; right? That's only fair. And that if someone was a part of a crime and admitted to being a part of that crime, then they should share in the jeopardy that my client is faced with, and that's spending the rest of his life in jail.

But did that happen? Did that happen in this case? Ladies and gentlemen of the jury, you are going to learn of a very sophisticated criminal enterprise in which sex was offered in return for work in assisting these two young star witnesses in robbing people.

Sex was used to entice the victims, and sex was used as the payoff. Where are they? Thank you.

(St. rec., vol. 5, pp. 691-693).

Clearly, counsel's primary point was that his client was entitled to equal justice. If others, who admitted to being part of the crime, were not standing trial, facing a lengthy prison sentence, then it was unfair to place his client in such a position. However, by linking the State's "two star witnesses" with an earlier robbery, then linking those same witnesses with the robbery Hutton was accused of committing, the argument is that an inference could be made that Hutton was also involved in the earlier robbery. The Court need not address whether counsel's performance was deficient in making this argument because the second prong of Strickland has not been met here. The Court finds that Hutton was not prejudiced by counsel's actions.

22

As noted above, the State provided overwhelming evidence of Hutton's guilt. (See supra at p. 12). Particularly compelling was Olivier Zieleniecki's testimony that Hutton actually pulled the trigger at point blank range. However, despite this evidence, the jury found Hutton guilty not of armed robbery as the State charged, but guilty of the lesser crime of first-degree robbery. The jury's finding in this regard does not suggest that they inferred, based upon counsel's remarks, that Hutton was guilty of multiple robberies. Accordingly;

## RECOMMENDATION

It is hereby **RECOMMENDED** that the petition of Cedric Hutton for issuance of a writ of habeas corpus under 28 U.S.C. §2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C.

§636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996)(<u>en banc</u>).[5]

New Orleans, Louisiana, this __18th__ day of ____September____, 2012.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[5]<u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.